IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| JOYCE A. BEVERLY,<br><br>       *Plaintiff,*<br><br>    v.<br><br>GATESHUDSON, *et al.*,<br><br>       *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:20-cv-1517<br>Hon. Liam O'Grady |

## MEMORANDUM OPINION & ORDER

Before the Court is Defendants' Rule 12(b)(6) motion (Dkt 13) to dismiss Plaintiff's amended complaint (Dkt. 12). For the reasons set forth below, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.   BACKGROUND

This dispute stems from a property management company's purported failure to accommodate a disabled resident, leading to her harm. Plaintiff Joyce Beverly is a retired 100% disabled veteran who leased an apartment managed by Virginia-based Defendant GatesHudson, Inc., for the lease term March 30, 2019 through March 29, 2020. Dkt. 1, at 2, ¶ 2.

When Ms. Beverly moved into the apartment, she was given "open" parking with no assigned spaces. *Id.* at 4, ¶ 13. A week later, she was hospitalized due to severe breathing difficulties. *Id.* ¶ 15. A short time after she was discharged from the hospital, on April 22, 2019, the apartment complex implemented an assigned parking system. *Id.* ¶ 16. Ms. Beverly was assigned a parking spot that was too far from the entrance of the apartment complex to accommodate her respiratory illness, which inhibits her ambulation. *Id.* ¶ 17. She met with the lease manager of the complex to request a spot reassignment based on her disability and offered

to provide medical documentation. *Id.* However, the lease manager informed Ms. Beverly that the apartment complex would "not get into the business of reassigning spaces for anyone," even though "only 9 cars were parking on [Ms. Beverly's] garage level" and there were many spaces open. *Id.* Shortly after this conversation, Ms. Beverly was admitted to the hospital for her respiratory illness. *Id.* at 5, ¶ 18.

On May 24, 2019, Ms. Beverly submitted a typed letter by mail to the same lease manager requesting a new handicapped parking space close to an elevator. *Id.* ¶ 19. In this letter, Ms. Beverly "stated she was a 100% disabled veteran and does not breathe well outside." *Id.* She complained that the "space she was assigned was very far from all doors." *Id.* She did not receive a response, so she went to the Leasing Office. *Id.* ¶ 21. There, she was informed that the letter never arrived. *Id.* She was again denied a parking space reassignment by the lease manager.

In the ensuing months, Ms. Beverly was forced to check herself into the hospital on numerous occasions for breathing issues. *Id.* at 5–6, ¶¶ 18, 22, 24. Ms. Beverly attributes these hospitalizations, in part, to the location of her parking spot. *See id.* at 5, ¶ 18.

Ms. Beverly's issues with Defendants were not limited to her parking space assignment. "In or around August 2019," the Defendants' failure to maintain the property resulted in animal waste accumulating in the indoor hallways outside Ms. Beverly's apartment, which further aggravated her respiratory issues. *See id.* at 5–6, ¶¶ 18, 24–25. The pet waste problem caused Ms. Beverly's health to deteriorate "to the point where she was afraid for her life," because "all her respiratory medication was increased to the maximum dosage, and every time she stepped foot into the building she was struck with breathing problems." *Id.* ¶ 26. As time passed, "she had severe chest pains and shortness of breath consistently." *Id.* She alleges that her

2

Pulmonologist opined "that the enormous amount of triggers at [the apartment] would continue to cause irreversible damage to her lungs, and possibly death." *Id.*  Ms. Beverly notified the lease manager of the pet waste issue at least as early as mid-August. *Id.* ¶ 25.  The lease manager's response did not assuage Ms. Beverly's concerns, *id.*, so she "sent a notice [to vacate the property] through the resident portal" on September 1, 2019. *Id.* ¶ 26.

Ms. Beverly did not receive a reply to her notice to vacate through the resident portal, and the pet waste issues persisted. *Id.* at 6–7, at ¶¶ 27–28.  A month later, on October 9, 2019, she "hand carried a letter to the Leasing Office and mailed a letter overnight to Defendants." *Id.* at 7, ¶ 28.  Her messages notified Defendants that she was "moving because of serious concerns for her health that deteriorated significantly during her [residency]." *Id.*  These messages apparently prodded Defendants into action; they offered to give Ms. Beverly a different parking spot if she stayed, and cleaned the carpet in front of her apartment for "the first and only time" since she moved into the complex. *Id.* ¶ 29.

Notwithstanding Defendants' late stage efforts to remedy the situation, Ms. Beverly refused to stay, explaining to Defendants that she had "already made arrangements to move[.]" *Id.*  This prompted an email from the lease manager, who stated that the pet issues "did not start until early September." *Id.* at 7–8, at ¶ 31.  The lease manager also offered to "provide [Ms. Beverly] a parking space closer to the elevator." *Id.* at 7–8, at ¶ 31.  Ms. Beverly did not respond positively to this proposal, so the lease manager's supervisor sent her an email, providing excuses for the parking and pet waste issues. *Id.* at 8, ¶ 32.  Ms. Beverly remained resolute. Ultimately, the lease manager sent her a "Reasonable Accommodation Request" form and a "Notice to Vacate" form on October 21, 2019. *Id.* ¶ 33.  Ms. Beverly "turned in [her] door key,

mailbox key, parking sticker, and key fob" to Defendants on October 31, 2019, and moved. *Id.*
¶ 34.

On November 6, 2019, Ms. Beverly "received a Collection Notice for $10,726.28 from
Hunter Warfield," a debt collection agency, "for the balance of the tenancy through March 29,
2020." *Id.* ¶ 35–36. That week, she returned to her former apartment, only to find it occupied.
*Id.* at 8–9, ¶ 36. Thereafter, Ms. Beverly received more collections letters from Hunter Warfield
with inconsistent amounts due and owing. *Id.* at 9, ¶ 37–38. None of these amounts matched her
ledger with Defendants, which showed a credit of $18.42. *Id.* ¶ 38. Ms. Beverly informed
Hunter Warfield that it was to direct any future communications to her attorney. *Id.* ¶ 39.
Nonetheless, they continued to call her, informing her of her outstanding balance and threatening
to turn her account over to the credit bureau if the balance was not paid. *Id.* On March 31, 2020,
Ms. Beverly's attorney received a letter from Hunter Warfield showing a balance owed in the
amount of $1,016.23. *Id.* ¶ 40. She then received an electronic credit report notifying her of
derogatory information that was put on her credit history by Hunter Warfield on December 27,
2019. *Id.* at 10, ¶ 41.

Ms. Beverly filed a complaint against Defendants on December 9, 2020. Dkt. 1. After
she amended her pleading, Dkt. 12, Defendants filed a motion to dismiss on April 13, 2021. Dkt.
13. The matter is fully briefed and ripe for review.

## II.   LEGAL STANDARD

Under Fed. R. Civ. P. 12(b)(6), a Court evaluates a Plaintiff's claims under *Twombly-*
*Iqbal*'s plausibility standard. *See Ashcroft v. Iqbal*, 566 U.S. 662, 678–79 (2009); *Bell Atl. Corp.*
*v. Twombly*, 550 U.S. 544, 555 (2007). Under this standard, the Court accepts as true the
Plaintiff's well-pleaded allegations, and views the complaint in the light most favorable to the

non-movant. *T.G. Slater & Son, Inc. v. Donald P. and Patricia Brennan LLC*, 385 F.3d 836, 841 (4th Cir. 2004). The Plaintiff must provide more than merely "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Rather, it must "allege facts sufficient to raise a right to relief above the speculative level, stating a claim that is plausible on its face, rather than merely conceivable." *Vuyyuru v. Wells Fargo Bank, N.A.*, 2016 WL 356087, at *2 (E.D. Va. Jan. 28, 2016) (citing *Iqbal*, 556 U.S. at 678).

### III.   DISCUSSION

Ms. Beverly asserts two federal claims and two Virginia tort claims.

### a.   Title VIII of the Civil Rights Act of 1968 (Fair Housing Act) (Count I)

Ms. Beverly first claims that Defendants violated the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(f)(2), by failing to reasonably accommodate her by refusing to provide handicap parking or clean common areas from animal waste. Dkt. 12, at 10, ¶ 42. FHA discrimination encompasses a "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). To state an FHA "failure to accommodate" claim, Ms. Beverly must plead facts that show that her requested accommodation was "(1) reasonable and (2) necessary (3) to afford [her] equal opportunity to use and enjoy [her] housing." *Bryant Woods Inn, Inc. v. Howard County, Maryland*, 124 F.3d 597, 603 (4th Cir. 1997).

Defendants defend against Ms. Beverly's FHA claim on two grounds.

First, they insist that Ms. Beverly has "not alleged facts sufficient to show that the alleged denial of an assigned parking space closer to the door was 'necessary' to afford here [sic] 'equal opportunity to use and enjoy' her apartment," because she (1) "does not allege that she dutifully

5

and regularly parked in her assigned parking space," (2) "does not allege that Defendants enforced a policy of towing any cars that were not parked in their assigned spaces," (3) "does not explain why she could not park in a different parking space, her assigned space notwithstanding," and (4) "does not allege that Defendants ever towed her car, or anyone else's car, for parking in a parking spot other than the one assigned to them." Dkt. 14, at 4.

In support of this position, Defendants cite *Doran v. Prince William County*, a case in which a Court in this District upheld a Condominium Association's denial of a handicapped resident's request for a reserved parking space in front of her unit because the resident "ha[d] a garage and a driveway directly connected to her unit and [chose] to park her sports car in her garage and allow her able-bodied daughter to park her daughter's car in the driveway." *Doran v. Prince William Cty.*, 2009 WL 10687839, at *1 (E.D. Va. Apr. 24, 2009). *Doran* has no persuasive impact here. The Plaintiff in *Doran* had access to two parking spots that satisfied her need for an accommodation. Ms. Beverly, by contrast, had none; she was refused even a single parking spot that allowed for her equal opportunity to use and enjoy her dwelling. *See* 42 U.S.C. § 3604(f)(3)(B).

The Court will not condone Defendants' refusal to comply with FHA obligations by forcing Ms. Beverly to incur the risk of being towed after Defendants implemented an assigned parking system and refused to provide her with an accessible space. *See, e.g.*, 24 C.F.R. § 100.204(b); *cf. Shapiro v. Cadman Towers, Inc.*, 844 F. Supp. 116, 123 (E.D.N.Y. 1994), *aff'd*, 51 F.3d 328 (2d Cir. 1995) (finding the provision of parking spaces to be a service provided by defendant, and finding that the defendant had duty to alter a first-come, first-served wait list policy to accommodate plaintiff's disability). Nor will the Court require Ms. Beverly, for no reason at all, to allege that she "dutifully and regularly parked" in a spot that endangered her life.

6

The relevant FHA provision at issue was not enacted to force disabled persons to gamble on their possessions and their well-being. Ms. Beverly was not obligated to violate Defendants' parking rules to render her cause of action under the Act viable. *See* Dkt. 14, at 5.

Second, Defendants argue that Ms. Beverly has failed to state an FHA "failure to accommodate" claim with respect to the pet waste issue because Defendants' duty to keep the apartment complex's floors free of dog urine is "an obligation owed to *all* tenants, and therefore does not constitute a 'reasonable accommodation' to the plaintiff." Dkt. 14, at 5–6 (citing *Costello v. Johnson*, 2011 WL 3820890, at *5 (E.D. Va. Aug. 29, 2011), *aff'd*, 470 F. App'x 102 (4th Cir. 2012)) (emphasis in original); *see also id.* at 6 ("Allowing Plaintiff a federal cause of action for this alleged failure to clean the common areas would grant her a special entitlement under the law for a concern that all tenants have an equal interest in addressing.").

Defendants correctly observe that allowing dog urine to fester outside of an apartment, standing alone, does not give rise to an FHA claim. *Cf. Armstrong v. Yopp Properties, LLC*, 2015 WL 627951, at *7 (E.D.N.C. Feb. 12, 2015), *aff'd*, 610 F. App'x 255 (4th Cir. 2015) ("Courts routinely have found failure to remediate mold, *without something more*, is not a cognizable claim under the FHA.") (emphasis added); *Costello v. Malcolm*, 2012 WL 2527019, at *4 (W.D. Va. June 29, 2012) ("[D]istrict courts have held that a landlord's failure to remediate mold, *without more*, is not actionable under the FHA.") (emphasis added). But Defendants' reliance on *Costello v. Johnson* is misplaced. Ms. Beverly is particularly susceptible to the lingering presence of pet waste due to her respiratory issues. *See* Dkt. 12, at 6, ¶ 25. This hypersensitivity does, in fact, give rise to an entitlement to request a reasonable accommodation under the FHA. *See Ogundimo v. Steadfast Property & Development, Inc.*, 2009 WL 650550, at *4 (E.D. Cal. Mar. 12, 2009) ("Here, Plaintiff specifically alleged that she suffered asthma . . .

7

[F]urther, her son also suffered asthma, and their asthma [was] exacerbated by the continuing

mold and Defendants' actions concerning the mold. . . . Plaintiff not only alleged that Defendants

knew of the health concerns and had ignored or responded in an untimely manner to her request

for accommodation, but [also] that Defendants had the requisite knowledge of the problem and

refused or responded so inappropriately to the request that the request for accommodation was in

effect rejected."); *see also Malcolm*, 2012 WL 2527019, at *5 (citing approvingly to *Ogundimo*);

*Johnson*, 2011 WL 3820890, at *6 (same); *Lee v. A & W Pritchard Enters., Inc.*, 2009 WL

3484068, at *2 (W.D. Ky. Oct. 23, 2009) ("[I]f a person without the plaintiff's disability would

be harmed *in the same manner as a person with the plaintiff's disability*, there is no claim under

the FHA") (emphasis added).  Accordingly, Defendants' failure to accommodate Plaintiff's

disability with respect to the pet waste issue is actionable under the FHA.  The timeline of Ms.

Beverly's communication of the pet waste issue to Defendants, and the timeliness of Defendants'

response, represents a fact issue for resolution at a later date.  *Compare* Dkt. 12, at 6, ¶ 25

(discussing the pet waste issue as manifesting in August 2019), *with id.* at 7, ¶ 30 (indicating that

the pet waste issue was communicated to Defendants as early as April 2019).

　　　In sum, Defendants' obligation to provide Ms. Beverly an accessible parking spot and a

living arrangement free of pet waste was reasonable and necessary to afford her an equal

opportunity to use and enjoy her housing.  *Bryant Woods Inn, Inc.*, 124 F.3d at 603.  Defendants'

motion to dismiss Count I is denied.

### b.  The Fair Credit Reporting Act (Count II)

　　　Ms. Beverly claims Defendants violated the Fair Credit Reporting Act (FCRA) by

"caus[ing] to have false derogatory information on Plaintiff's credit report, in violation of . . . 15

U.S.C. § 1681s-2b."  Dkt. 12, at 10–11, ¶ 43.  The Parties agree that Ms. Beverly's FCRA claim

may proceed only if Defendants are deemed "furnishers of information" under the meaning of Section 1681s-2b of the FCRA. *Compare* Dkt. 14, at 6–8, *with* Dkt. 16-1, at 9.

To that end, the Court finds that Defendants were not "furnishers of information" in this situation because they did not transmit any information to a credit reporting agency. *See, e.g., Alam v. Sky Recovery Servs., Ltd.*, 2009 WL 693170, at *4 (S.D. Tex. Mar. 13, 2009); *Thomasson v. Bank One*, 137 F.Supp.2d 721, 723 (E.D. La. 2001); *Carney v. Experian Info. Solutions*, 57 F. Supp. 2d 496, 501 (W.D. Tenn. 1999); *see also* 15 U.S.C. § 1681s-2b(a)(1)(A) ("A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate."). That is not to say landlords cannot qualify as "furnishers of information." *See, e.g., Pleznac v. Equity Residential Mgmt., LLC*, 320 F. Supp. 3d 99, 106 (D.D.C. 2018); *Banks v. Stoneybrook Apartment*, 2000 WL 1682979, at *2 (M.D.N.C. June 1, 2000), *aff'd*, 232 F.3d 888 (4th Cir. 2000). However, for liability to attach, there must be some direct reporting of financial information by the Defendant to the credit reporting agency.

In this case, Hunter Warfield was the furnisher of Ms. Beverly's information, not Defendants. Ms. Beverly's unsupported "chain reaction" theory would extend FCRA liability far beyond that which Section 1681s-2b's text can reasonably accommodate. *Contra* Dkt. 16-1, at 9 ("Common sense dictates that Defendant GatesHudson is clearly the furnisher of information as provided to the collection agency Hunter Warfield and ultimately to Equifax and Transunion on GatesHudson's behalf."). Hunter Warfield was not acting as GatesHudson's agent when it reported Ms. Beverly's putative debt to the credit reporting agencies; it was pursuing its own agenda as a debt collector. See H.R. Rep. No. 108-263, at 24 (2003) ("The most common . . . furnishers of information are credit card issuers, auto dealers, department and grocery stores,

9

lenders, utilities, insurers, *collection agencies*, and government agencies.") (emphasis added). Count II must fail.

### c. Ms. Beverly's state law claims (Counts III and IV)

The Court also finds that Ms. Beverly's state law claims must fail.

Count III must be dismissed because the second and fourth elements of the tort of intentional infliction of emotional distress are not adequately pleaded under Virginia law. *See Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991).

With respect to the second element, Defendants' conduct, while callous, was not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See Harris v. Kreutzer*, 624 S.E.2d 24, 33 (Va. 2006); *see also Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 220 (4th Cir. 2015) (citing *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 472–73 (4th Cir. 1999); *Lewis v. Gupta*, 54 F. Supp. 2d 611, 621 (E.D. Va. 1999); *Delk v. Columbia/HCA Healthcare Corp.*, 523 S.E.2d 826, 833 (Va. 2000)); *Burke v. AT&T Technical Services Co., Inc.*, 55 F. Supp. 2d 432, 441 (E.D. Va. 1999) (holding that insidious racial discrimination does not rise to the level of "outrageous and intolerable" conduct); *Ortiz v. Panera Bread Co.*, 2011 WL 3353432, at *6 (E.D. Va. Aug. 2, 2011) ("The second element of the claim cannot be satisfied by alleging that the defendant's behavior was tortious, or even criminal."); *Hyatt v. Avco Fin. Servs.*, 2000 WL 33912656, at *9 (E.D. Va. Mar. 2, 2000), *aff'd*, 22 F. App'x 81 (4th Cir. 2000) (holding that humiliating discrimination does not rise to the level of "outrageous and intolerable" conduct); *Karpel v. Inova Health Sys. Servs., Inc.*, 1997 WL 38137, at *7 (E.D. Va. Jan. 27, 1997) (holding that terminating an employee because of discriminatory animosity does not rise to the requisite level of "outrageous").

10

Ms. Beverly's "resulting emotional distress" also falls below the threshold of what is required to satisfy the fourth element of the tort. *See Russo*, 400 S.E.2d at 163. Specifically, "[t]here is no claim . . . that [Ms. Beverly] had any objective physical injury *caused by the stress*, that she sought medical attention [because of the stress], that she was confined at home or in a hospital, or that she lost income." *Id.* (emphasis added). Going off the facts alleged, Ms. Beverly's physical symptoms were triggered by her long walk from her parked car and the pet waste outside her door, not the emotional response of being denied accommodations by Defendants. Dkt. 12, at 11, ¶ 45. She details symptoms of "insomnia," "anxiety," and "fear of death." *Id.* But these conditions, in aggregate, are not enough to show "severe emotional distress" under Virginia law. *See, e.g., Williams v. Nesterick*, 2021 WL 415133, at *5 (E.D. Va. Feb. 5, 2021); *Stout v. Allstar Therapies, Inc.*, 2018 WL 1981901, at *3 (E.D. Va. Apr. 27, 2018); *Quick v. Essex Bank*, 2017 WL 2624214, at *5 (E.D. Va. June 16, 2017); *Boyce v. Bennett*, 2014 WL 12561596, at *6 (E.D. Va. Nov. 3, 2014). Case law in this District has required at least some combination of physical injury, injury to reputation, financial loss, home confinement, and/or clinical treatment in addition to the symptoms Ms. Beverly outlines to satisfy the fourth element. *See, e.g., Steele v. Goodman*, 382 F. Supp. 3d 403, 425–26 (E.D. Va. 2019); *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 759 (E.D. Va. 2016); *Faulkner v. Dillon*, 92 F. Supp. 3d 493, 502 (W.D. Va. 2015). None of these conditions are detailed in the operative complaint.

Count IV must likewise fail. Absent physical impact, Ms. Beverly must plead facts plausibly demonstrating "that [her] physical injury was the natural result of fright or shock proximately caused by the defendant's negligence." *Lucas v. Henrico Cty. Sch. Bd.*, 822 F. Supp. 2d 589, 609 (E.D. Va. 2011); *see also Sykes v. Bayer Pharm. Corp.*, 548 F. Supp. 2d 208,

11

217 (E.D. Va. 2008) (citing *Delk*, 523 S.E.2d at 834). Taking Ms. Beverly's allegations as true and viewing the facts most favorable to her, the Court cannot plausibly infer "a clear and unbroken chain of causal connection" that links Defendants' purported negligence with physical injuries suffered by Ms. Beverly resulting from "fright or shock."

## IV.    CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** AND **DENIES IN PART** Defendants' Rule 12(b)(6) motion to dismiss Plaintiff's amended complaint. Dkt. 13. Counts **II, III, and IV** are **DISMISSED**. Defendant is **DIRECTED** to file an answer within fourteen (14) days of the date of this Order.

It is **SO ORDERED.**

May 6, 2021
Alexandria, Virginia

Liam O'Grady
United States District Judge